**CTC COMMUNICATIONS, INC., Plaintiff,**

v.

**BELL ATLANTIC CORPORATION, Defendant.**

**Civil No. 97–395–P–C.**

United States District Court, D. Maine.

July 31, 1998.

Michael A. Nelson, Jensen, Baird, Gardner & Henry, Portland, ME, Rodger D. Young, Anthony P. Cho, Steven Susser, Young & Associates, Southfield, MI, for Plaintiff.

Richard H. Dolan, Katherine M. Oberlies, Jeffrey M. Eilender, Schlam, Stone & Dolan, New York City, Robert M. Hayes, Melinda J. Caterine, Jonathan E. Kapp, Moon, Moss, McGill & Bachelder, P.A., Portland, ME, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

On January 30, 1998, United States District Judge Kimba M. Wood, sitting in the Southern District of New York, granted a Temporary Restraining Order ("TRO") enjoining CTC Communications Corporation ("CTC") from "soliciting the customers CTC serviced as a sales agent for Bell Atlantic under the Agency Agreement" and using "Bell Atlantic's trademarks and trade name in promotional, advertising or other market material without permission of Bell Atlantic." Interdistrict Transfer Record ("ITR") (Docket No. 1 in 98–79–P–C) at Southern District of New York ("SDNY") (Docket No. 13). At that time, the Court also enjoined CTC's

"use of confidential information as identified in the discussion above." *Id.* On February 2, 1998, Judge Wood filed an Amended Order which did not, in any substantive way, alter the previously filed order granting a TRO to Bell Atlantic Corporation ("Bell Atlantic"). *Id.* at SDNY (Docket No. 15). That case was transferred to this district on March 11, 1998, and later consolidated with the instant action. *See* 98–79–P–C.

## I. PROCEDURAL POSTURE

The Court now has before it Plaintiff CTC Communications' Motion and Incorporated Memorandum in Support of Motion to Dissolve Temporary Restraining Order or, in the Alternative, for an Evidentiary Hearing and Consideration Whether the Temporary Restraining Order Should Be Expanded to a Preliminary Injunction (Docket No. 38), in which CTC asserts that the TRO should be dissolved and an evidentiary hearing held to resolve the factual disputes between the parties relevant to Bell Atlantic's entitlement to a preliminary injunction. In response, Defendant Bell Atlantic asserts that the injunctive relief ordered by Judge Wood was a Preliminary Injunction and that there is no procedural basis for vacating the injunction. The Court disagrees with Bell Atlantic's characterization of Judge Wood's Order. The only injunctive relief ever ordered in this case was a TRO, and that TRO has now been in effect for more than five months. *See* SDNY, Order of January 23, 1998 (Docket No. 12); SDNY, Order of January 28, 1998 (Docket No. 14); SDNY, Order of January 30, 1998 (Docket No. 13); SDNY, Amended Order of February 2, 1998 (Docket No. 15).

"The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction. Such an order is necessarily limited to a very brief period because what may later prove to be a right of the party who is restrained is suspended

before even a tentative adjudication as to the right has been had." *Pan Am. World Airways, Inc. v. Flight Engineers' Intern. Ass'n,* 306 F.2d 840, 842–43 (2d Cir.1962). Federal Rule of Civil Procedure 65(b) sets a ten-day limit on the life of a TRO issued ex parte, permitting an extension of no more than ten days unless the party against whom it is directed consents to a longer period. Here the TRO was not issued without notice but, rather, was ordered by Judge Wood in the presence of counsel for both parties. Although Rule 65(b), by its terms, applies only to orders issued without notice, this Court will treat the rule as instructive on the nature of temporary injunctive relief.

If the Court were to conclude that the instant TRO, issued with notice to the parties, has unlimited duration, "this interpretation would read out of [Rule 65(b)] the requirement of consent of the restrained party to an extension beyond a second 10 day period, since it would, in effect, substitute mere notice to, or the presence of, the party for its consent." *Connell v. Dulien Steel Products, Inc.,* 240 F.2d 414, 417 (5th Cir. 1957). Notice cannot serve to extend indefinitely the time during which a TRO remains effective. Therefore, the Court granted CTC's motion for an evidentiary hearing to decide whether Bell Atlantic is entitled to a preliminary injunction. Before the evidentiary hearing began, the parties agreed to have the Court hear and decide the pertinent parts of the merits of Bell Atlantic's claims in Counts II, III, and V, and order the appropriate declaratory and/or injunctive relief.[1] To that end, the Court makes the following findings of fact.

## II. FACTS

Bell Atlantic is a telecommunications carrier that sells telecommunication services in the mid-Atlantic states, New York, and New England. CTC's First Amended Complaint (Docket No. 21) ¶ 4. Bell Atlantic is the corporate successor to NYNEX.[2] *Id.* ¶ 5. Bell

---

1. Although acting on both CTC's Motion to Dissolve and Bell Atlantic's oral Motion for Permanent Injunction, the Court will treat Bell Atlantic as the moving party with respect to the burden of proof.

2. When the Agency Agreement at issue in this case was drafted, NYNEX was the corporate entity contracting with CTC. Thus, some of the facts of this case involve NYNEX. NYNEX has since become Bell Atlantic. Throughout this opinion,

Atlantic provides local exchange telephone service within a specified geographic area. *Id.* ¶ 10. CTC is in the business of selling telecommunication services to customers in New York and New England. *Id.* ¶ 3. Beginning in 1984, CTC sold intraLATA services pursuant to a series of agency agreements with Bell Atlantic; Bell Atlantic also sold these services directly. *Id.* ¶ 25. Over the last few years, approximately ninety percent of CTC's income was generated by its agency relationship with Bell Atlantic. Tr. at 223. The most recent agency agreement between CTC and Bell Atlantic is dated February 1, 1996 ("the Agency Agreement"), and established that CTC would serve as a sales agent for Bell Atlantic in its Account Management Plan ("AMP") Program. CTC Ex. 1. As an AMP agent, CTC sold Bell Atlantic products to end-users, and was paid a commission on each such sale. In addition, under the unique terms of the AMP, Bell Atlantic also paid fees to CTC to manage the relationship between Bell Atlantic and its customers by providing information and service to the customer at no additional charge to the customer. CTC acted as Bell Atlantic's face to the designated AMP customers.

The Agency Agreement was negotiated during the months leading up to the enactment of the Telecommunications Act of 1996—a period of great uncertainty in the telecommunications industry. The Telecommunications Act of 1996, codified in part at 47 U.S.C. § 251, took effect on February 8, 1996. Act of February 8, 1996, Pub.L. No. 104–104, 1996 U.S.C.C.A.N. (110 Stat.) 56,-161. That Act imposes certain obligations on local exchange carriers to foster the growth of competition for telecommunications services involving calls that originate and terminate within a local access and transport area ("LATA").[3] One of the results of the Act was the emergence of resale of telecommunications services in intraLATA markets. The Agency Agreement was finally executed by CTC and Bell Atlantic in March and April 1996, respectively. In December 1997, CTC and Bell Atlantic entered into written Resale Service Agreements for the resale of Bell Atlantic's intraLATA telecommunications services ("the Resale Agreements"). CTC Ex. 2.

The agency relationship between CTC and Bell Atlantic was terminated sometime in late December of 1997.[4] In the pertinent parts of Counts II and III of its First Amended Complaint, Bell Atlantic alleges that CTC has violated the noncompetition provision of the Agency Agreement by soliciting and promoting competing telecommunications services and using confidential information acquired during CTC's employment as an agent for Bell Atlantic to promote and sell telecommunications services which compete directly with Bell Atlantic services.[5] Bell Atlantic's First Amended Complaint ¶¶ 77–93. Count V alleges in part that, through CTC's various acts in violation of the noncompetition clause of the Agency Agreement and wrongful use of confidential information, CTC has breached its fiduciary duty owed to Bell Atlantic. *Id.* ¶¶ 107–15. For these violations, Bell Atlantic seeks an order de-

references to both NYNEX and Bell Atlantic should be understood to mean the corporate entity now known as "Bell Atlantic."

**3.** As defined by the Telecommunications Act of 1996:

The term "local access and transport area" or "LATA" means a continuous geographic area (A) established before February 8, 1996, by a Bell operating company such that no exchange area includes points within more than 1 metropolitan statistical area, consolidated metropolitan statistical area, or State, except as expressly permitted under the AT & T Consent Decree; or (B) established or modified by a Bell operating company after February 8, 1996, and approved by the Commission.

47 U.S.C. § 153(25).

**4.** The Court expresses no opinion about which party instigated the termination of the Agency Agreement, because that determination is outside the scope of this decision.

**5.** Although Bell Atlantic raised the issue of CTC's use of confidential information in connection with its breach of contract claims in Counts II and III, the parties have argued the issue entirely in connection with the breach of fiduciary duty presented in Count V. Therefore, the Court will address CTC's use of confidential information in its breach of fiduciary duty discussion, because there is no argumentation before the Court regarding the issue as it relates to the provisions of the Agency Agreement.

claring that the solicitation by CTC, until December 30, 1998, of the same customers for whom CTC was Bell Atlantic's agent is prohibited by the Agency Agreement and CTC's use at any time of any of the confidential information obtained by CTC during the agency relationship for the purpose of carrying out CTC's obligations as Bell Atlantic's agent ·constitute a breach of CTC's contractual obligations as well as its fiduciary duties to Bell Atlantic. Bell Atlantic also seeks permanent injunctive relief to prevent CTC from (1) selling or promoting the sale of any telecommunications services, until December 30, 1998, to any Bell Atlantic business customer to whom CTC has sold Bell Atlantic service in the 12 months prior to December 30, 1997; (2) using Bell Atlantic's confidential information, including customer lists, price lists, compensation information, information contained in any confidential customer surveys, and other information; and (3) using Bell Atlantic trademarks and trade names.

## III. DISCUSSION

### A. Agency Agreement

At the center of the controversy in this case is the noncompetition clause of the Agency Agreement, which was drafted exclusively by Bell Atlantic's predecessor, NYNEX. The noncompetition clause provides that CTC, identified as Representative, agrees to

> [n]either represent for sale, refer, promote, negotiate or otherwise market any other network service which displaces, or is in competition with, IntraLATA service offered by NYNEX.... Furthermore, for a period of twelve (12) months after the expiration or termination of this Agreement Representative may not sell, represent, or promote any non-NYNEX IntraLATA services to any NYNEX Business Customer for whom Representative was responsible under the AMP Program, or to whom Representative sold any NYNEX

Service, within 12 months prior to such expiration or termination.

Agency Agreement, CTC Ex. 1 § D.1.s, at 8. In determining the meaning of the post-termination noncompetition clause, Judge Wood concluded that the phrase "IntraLATA services" must be construed in accordance with analogous terms in the AT & T Consent Decree and the opinions of Judge Harold Greene interpreting the Consent Decree.[6] ITR at SDNY (Docket No. 15) at 11–12. Using those opinions for guidance, Judge Wood determined that the term "IntraLATA services" in the Agency Agreement "includes not only. voice and data transmission services but also customer and technical support, sales contracting, billing and other such non-transmission services." *Id.* at 12. Ultimately, a TRO was issued preventing CTC from reselling to the customers it had previously serviced on behalf of Bell Atlantic because Bell Atlantic had established a likelihood of success on the merits of its claim that the post-termination noncompetition provision prohibited CTC, as a reseller, from selling Bell Atlantic's intraLATA transmission services coupled with CTC's nontransmission services. *Id.*

Here, Bell Atlantic contends, as it did before Judge Wood, that the post-termination noncompetition provision of the Agency Agreement prevents CTC from selling telecommunications services purchased from Bell Atlantic's wholesale arm to the forbidden customers. This activity, Bell Atlantic asserts, is proscribed by the noncompetition clause because when CTC resells the voice and data transmission space it purchased from Bell Atlantic coupled with CTC's own customer and technical support, sales contracting, billing, and other nontransmission services, it is actually offering non-Bell Atlantic intraLATA service. Under Bell Atlantic's interpretation of the post-termination noncompetition provision, CTC is permitted only to refer Bell Atlantic services to the specified customers. CTC argues ·that the noncompetition provision prohibits CTC from selling only products and services that do not

---

**6.** There was no evidence presented that the parties to the negotiation of the Agency Agreement knew the meaning of the term "intraLATA service" ascribed by Judge Green in his opinions interpreting the AT & T Consent Decree. Moreover, neither the opinions nor the Consent Decree was entered into evidence or relied upon by the parties in this proceeding.

originate from Bell Atlantic, such as AT & T's telecommunications services, to the customers for whom CTC was acting as Bell Atlantic's sales agent.

### 1. Ambiguity

 The threshold question of whether a writing is ambiguous is the exclusive province of the court. *Red Rock Commodities, Ltd. v. Standard Chartered Bank,* 140 F.3d 420, 423 (2d Cir.1998); *Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 429 (2d Cir.1992). The search for ambiguity must be conducted within the four corners of the document. *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990); *Adler & Shaykin v. Wachner,* 721 F.Supp. 472, 476, 479 (S.D.N.Y.1988); *W.W.W. Assoc., Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.") (citations omitted). "Contract language is not ambiguous if it has a 'definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Ins. Co. of North America,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280, 1282–83 (1978)). Contracts are not rendered ambiguous simply because the parties to the contract disagree on a meaning or urge different interpretations in the litigation. *See, e.g., Seiden Assoc., Inc.,* 959 F.2d at 428; *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990); *Hunt Ltd.,* 889 F.2d at 1277. New York courts "have defined ambiguous language as that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden Assoc., Inc.,* 959 F.2d at 428 (citations and internal quotations omitted).

 The parties disagree about the meaning of the phrase "any non-NYNEX IntraLATA services." The Agency Agreement at issue does not define the term "non-NYNEX." The Telecommunications Act defines the term "LATA," but neither the contract nor the Act defines the term "intraLATA services." Moreover, none of the witnesses, all presumably familiar with the telecommunications industry, asserted that the phrase "intraLATA services" is understood in the industry to mean what Judge Greene has determined it means. The Court finds that the phrase "any non-NYNEX IntraLATA services," as used in the noncompetition clause of the Agency Agreement, is ambiguous. When, as here, ambiguity exists, the resolution of the ambiguity hinges on such extrinsic matters as the credibility of witnesses or documents or upon choosing one among several reasonable inferences that may be drawn from such extrinsic evidence. Because the Agency Agreement's post-termination noncompetition provision is ambiguous, the Court may and does consider parol evidence to determine its meaning.

### 2. The Negotiations

In August of 1995, NYNEX management and the agents, including CTC, began discussion of the Agency Agreement. Messenger Aff. ¶ 16. The parties continued to negotiate, either through formal committee meetings or via conference calls, through approximately January 1996. *Id.* One of the clauses repeatedly discussed by the parties became known in the final agreement as "D.1.s"—the noncompetition clause. The original draft of the post-termination noncompetition provision prohibited CTC from selling "any IntraLATA services" to customers to which it had sold services as a Bell Atlantic agent for twelve months following the termination of the agreement. CTC Ex. 3 and 4. The phrase "any IntraLATA services" was later changed to "any non-NYNEX IntraLATA services." *See* CTC Ex. 1, 3, and 4.

Explaining the change, Robert Fabbricatore, CEO of CTC, and David Mahan, Vice President of Marketing and Strategic Planning for CTC, stated that they both "told [NYNEX employees] Mr. Borzuku and Mr. Messenger that CTC would not agree to a contract containing that provision, because,

among other things, it was rumored that NYNEX would not continue the agency program, and the provision would virtually put CTC out of business." Affidavit of Robert Fabbricatore ¶ 6; Affidavit of David Mahan ¶ 6. At the time of the contract negotiations over the Agency Agreement, "it seemed likely that the option of reselling or 'brokering' [IntraLATA] services would be included in the impending national Telecommunications Act." Fabbricatore Aff. ¶ 7; Mahan Aff. ¶ 7. Given the probable eventuality of a more open marketplace, Mr. Fabbricatore indicated to NYNEX that CTC "would agree not to sell or promote the IntraLATA services of other companies such as AT & T, GTE, or MCI to the designated customers for 12 months, but that CTC would insist on having the ability to sell or resell services that originated from NYNEX." Fabbricatore Aff. ¶ 7; Mahan Aff. ¶ 7.

Mr. Mahan testified that he had specific discussions with representatives of Bell Atlantic regarding the post-termination viability of CTC and, from those discussions, the parties "[f]undamentally [ ] reached an agreement . . . that for one year [CTC] could sell, we would have to sell only Bell Atlantic product to those customers." Tr. at 230. Mr. Fabbricatore testified that he, in fact, proposed this as a compromise "because it would prevent CTC from 'taking away' customers of NYNEX, in that any of the customers that purchased IntraLATA services from CTC would still be buying NYNEX services." Fabbricatore Aff. ¶ 7; Mahan Aff. ¶ 7. Messrs. Fabbricatore and Mahan testified that "Mr. Borzuku and Mr. Messenger agreed with [CTC's] proposal on behalf of NYNEX." Fabbricatore Aff. ¶ 8; Mahan Aff. ¶ 8. This was the reason, Mr. Fabbricatore and Mr. Mahan assert, that "NYNEX changed the provision from a prohibition on the sale of 'any' IntraLATA services to a prohibition on the sale of 'non-NYNEX' IntraLATA services." Fabbricatore Aff. ¶ 8; Mahan Aff. ¶ 8.

Although in agreement with the fact that the language was changed, John Messenger, the drafter of the Agency Agreement, insisted that resale was not a topic of discussion between the parties during the contract negotiations. Tr. at 47–48. With regard to the change, Mr. Messenger testified NYNEX initially "proposed express post-termination restrictions on an agent's ability to solicit customers it had served as NYNEX's agent. The agents, not surprisingly, preferred that there be no post-termination restrictions on their ability to solicit the customers they serviced on behalf of NYNEX." Messenger Aff. ¶ 17. Mr. Messenger stated that the "agents eventually accepted the appropriateness of a post-termination limitation on their ability to solicit [the former] customers."[7] Id. ¶ 22. However, Mr. Messenger, explaining the change, testified that one of the agents

pointed out one way in which the paragraph, as drafted, was inadvertently overbroad. It was common in the industry for firms which were neither NYNEX sales agents nor competing intraLATA service providers (such as equipment vendors or telecommunications consultants) to recommend NYNEX services to their customers, to refer their customers to NYNEX for the purchase of those services, or even assist their customers by placing orders with NYNEX on their behalf, under a letter of authorization from the customer. . . . Many of our authorized sales agents had started out as equipment vendors or consultants, and many continued to engage in those businesses as an adjunct or compliment to their sales agent activities. It was pointed out that NYNEX had no reason to want to prohibit a former agent from referring customers to NYNEX in this manner for intraLATA services even within 12 months after termination of the agency relationship. But the clause, as initially drafted, might have been construed to prohibit the former sales agent from engaging in these

7. Mr. Messenger was the only representative from Bell Atlantic to testify about the negotiation of the changes to the noncompetition provision. Nick Borzuku was the NYNEX employee most familiar with the Agency Agreement and was intimately involved in the negotiations on behalf of Bell Atlantic. Tr. at 69. The record reveals that when the issue was considered by Judge Wood, she had the benefit of Mr. Borzuku's testimony. It is not known what benefit, if any, Mr. Borzuku's affidavit was to Judge Wood.

activities. Therefore [Mr. Messenger] added the phrase 'non-NYNEX intra-LATA service[s]' [sic] to the final version of the Agreement.

*Id.* ¶¶ 22–23; *see also* Tr. at 93–94.

At the hearing, Mr. Messenger testified that, when he drafted the agreement, he intended "non-NYNEX" in the third sentence to be shorthand for the phrase "any other network service which displaces, or is in competition with, IntraLATA service offered by NYNEX" from the first sentence. Tr. at 50–51. "Nothing in D.1.s was ever intended to exempt from the non-competition provisions a former agent who elected to become a reseller of NYNEX (Bell Atlantic) telecommunications services. None of the agents, including CTC, ever raised this issue, or expressed a desire for an exemption of this type." Messenger Aff. ¶ 26. Mr. Messenger further explains that his intent, in drafting the clause, was not to "allow a former sales agent to offer, on its own, *any* intraLATA service to a customer for whom that agent had served as NYNEX's agent. When any entity purchases telecommunications services at wholesale and resells it to end-user customers, that 'reseller' is a competitor. From the end-user customer's view that customer is purchasing telecommunications services from the reseller rather than from NYNEX." [8] *Id.* ¶¶ 24–25.

### 3. Meaning of the Ambiguous Terms

■ The issue itself is a difficult one, further compounded by conflicting testimony requiring the Court to make credibility judgments about some of the witnesses. The Court finds CTC's account of the contractual negotiations more plausible and CTC's witnesses more credible. Moreover, the Court concludes that the pending telecommunications legislation necessarily informed the parties conduct during the negotiations of the Agency Agreement.

The first sentence in the noncompetition clause addresses the time when the Agency Agreement is in place to prevent CTC from selling a competitor's (*e.g.* AT & T, MCI, Sprint) services to the restricted Bell Atlantic customers. The meaning of that phrase in the first sentence, addressing the prohibition against CTC selling IntraLATA services for Bell Atlantic's competitors, which when shorthanded in the third sentence, would address the same group of competitors, as opposed to the same group of competitors plus the newly created reseller. It is unlikely that the change was made to allow Bell Atlantic AMP agents, such as CTC, to refer NYNEX telecommunications services when making hardware sales to businesses in the 12 months following the termination or expiration of the Agency Agreement. There is no evidence in the record that, at that time, any of the AMP agents, including CTC, were selling or planning to sell telephone hardware. Bell Atlantic's construction is tortured.

The Court finds that Messrs. Fabbricatore and Mahan specifically negotiated the change to the post-termination noncompetition provision. The testimony of Messrs. Fabbricatore and Mahan persuades the Court that the change was made during the contract negotiations to permit CTC, if the opportunity presented itself, to become a reseller to the same customers it had serviced for Bell Atlantic.

The Court heard considerable testimony about the 1995 discussions between Bell Atlantic and CTC regarding CTC's state public utility commission filings in New England seeking authorization to offer intraLATA services. Affidavit of Jerome Lovosco ¶ 10.[9] Upon learning of the filings in June of 1995, Bell Atlantic made it clear to CTC that selling intraLATA services under CTC's own name was inconsistent with CTC's obligations of loyalty as a NYNEX sales agent. *Id.* ¶ 10. CTC argued that the Agency

---

8. The Court does not find it credible that the parties were negotiating the terms of the Agency Agreement with an eye to the meanings that third parties would ascribe to the terms. The Court believes that the Agency Agreement was negotiated and drafted according to the understanding of the contracting parties.

9. Although Mr. Lovosco was a party to the discussions between Bell Atlantic and CTC regarding the state public utilities commissions filings, Mr. Lovosco was not a participant in the negotiation of the Agency Agreement. Tr. at 68–70.

Agreement allowed CTC to seek authorization to offer intraLATA services in New England to businesses which it did not serve as Bell Atlantic's agent. *Id.* ¶ 11. On behalf of Bell Atlantic, Mr. Lovosco rejected CTC's argument and explained that Bell Atlantic thought this activity would create a potential conflict of interest with Bell Atlantic. *Id.* Accordingly, Mr. Lovosco made it clear to CTC that it would not allow CTC to offer intraLATA services. *Id.* at ¶ 10. CTC ultimately "amend[ed] its petitions in each of the six states served by NYNEX to make clear that it would not compete with NYNEX for intraLATA service." Messenger Aff. 32; *see also* Lovosco Aff. at 11. CTC again made filings in December 1995. Lovosco Aff. ¶ 12. This time, Mr. Messenger reiterated NYNEX's position to CTC. Lovosco Aff. ¶ 12; Messenger Aff. ¶ 30. CTC explained that the language was "boiler plate" inserted by mistake as part of another filing. In any event, CTC again withdrew the offending part of its petitions. Messenger Aff. 34; Lovosco Aff. ¶ 12.

As far as the Court can ascertain, the conversations and correspondence regarding the state public utility commission filings related only to the time during which CTC was an agent for Bell Atlantic. There is no evidence in this record of discussions regarding the post-agency termination effect of the public utility commission filings. It is too speculative to draw any conclusions about what the parties intended after termination of the Agency Agreement from the conduct or discussions of the parties regarding the state utility commission filings during the contract negotiations or thereafter regarding impermissible activities for CTC during the agency relationship.

The Court confirms its conclusion by considering the testimony regarding Bell Atlantic's profit on the wholesale side of its business. CTC, as a telecommunications reseller, although in one sense a competitor to Bell Atlantic, is monetarily a distinct creature from Bell Atlantic's competitors prior to the Telecommunications Act. The

testimony revealed that when CTC, or any other provider, buys from Bell Atlantic's wholesale arm, Bell Atlantic makes the same profit it would have made if it had sold the product retail. Tr. at 41–42. Bell Atlantic's discounted wholesale price simply represents the Bell Atlantic's retail price less its avoided cost. *Id.* Thus, it appears that Bell Atlantic makes the same, or substantially the same, profit whether it sells wholesale or retail. Bell Atlantic makes no profit if the customers turn to a true competitor, one existing prior to the Telecommunications Act, for its telecommunications services. Therefore, the Court draws a reasonable inference that, when negotiating the agreement while the telecommunications legislation was pending, a compromise was reached that if within twelve months after the termination of the Agency Agreement, if CTC became a reseller, it was permissible for CTC to resell Bell Atlantic service to the otherwise forbidden customers.[10] Accordingly, the Court concludes that CTC has not breached the Agency Agreement with regard to soliciting Bell Atlantic's customers.

### B. Fiduciary Duty

In addition to its claims regarding CTC's alleged breach of the Agency Agreement, Bell Atlantic requests declaratory and injunctive relief for two distinct breaches of fiduciary duty. Bell Atlantic argues that CTC has breached its fiduciary duty to Bell Atlantic in the following two respects: (1) by failing to disclose all material information (*i.e.*, its intentions regarding the possibility of resale with respect to the customers it serviced for Bell Atlantic pursuant to the Agency Agreement) during the negotiations of the 1996 Agency Agreement; and (2) by soliciting customers for whom CTC had served as Bell Atlantic's agent and using Bell Atlantic's confidential information to do so. Both parties agree that the breach of fiduciary duty questions presented in this action are governed by New York law.

---

**10.** The Court notes that, in December 1997, the parties entered into Reseller Agreements permitting CTC to sell IntraLATA services in New York and New England. CTC Ex. 2. Bell Atlantic could have limited the Reseller Agreements to businesses other than those serviced by CTC as Bell Atlantic's agent, but it did not do so.

### 1. Negotiation of the 1996 Agency Agreement

Bell Atlantic argues that the fiduciary relationship between Bell Atlantic and CTC at the time of the negotiations regarding the 1996 Agency Agreement obligated CTC to disclose all information which CTC had reason to believe would be material to Bell Atlantic, but was not already known to Bell Atlantic, during the negotiations. Specifically, Bell Atlantic asserts that CTC breached this fiduciary duty by failing to disclose its intent regarding the possibility of becoming a reseller if the opportunity to do so arose. Bell Atlantic urges the Court to find that CTC failed to make Bell Atlantic aware of its intent and that, as a result of this failure, CTC is precluded from taking advantage of the fruits of its deception; namely, the changes to the third sentence of the noncompetition clause of the Agency Agreement. CTC does not directly address this argument in the context of its discussion of Bell Atlantic's fiduciary duty claims,[11] but CTC did present testimony, with regard to its position on the meaning of the noncompetition clause, indicating that CTC was aware of the possibility that federal law might create both opportunities for reselling and incentives on Bell Atlantic's behalf to terminate the Agency Agreement. Fabbricatore Aff. ¶ 6. Given this atmosphere, CTC was trying to ensure its continuing livelihood by preserving an option to resell Bell Atlantic services to those customers constituting ninety percent of CTC's revenues. The critical question for the Court is whether Bell Atlantic knew of CTC's intentions through information provided by CTC during the course of the negotiations.

■■■ Bell Atlantic correctly asserts that, under New York law, " 'an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.' " *Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.,* 117 A.D.2d 284, 502 N.Y.S.2d 165, 171 (N.Y.App.Div.1986) (quoting *Restatement (Second) of Agency* § 381). "[A] fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect. This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum,* 73 N.Y.2d 461, 541 N.Y.S.2d 746, 539 N.E.2d 574, 576 (1989) (internal citations omitted). Furthermore, according to the comment on subsection (a) of section 396 of the *Restatement (Second) of Agency,* "[a]lthough an agent has no duty after the termination of the agency not to compete with the principal, during the continuance of the agency he has a duty not to do disloyal acts looking to future competition." Thus, it is apparent that an agent owes a duty to its principal to disclose information which is material to the interests of the principal, including situations in which silence on the part of the agent places the principal at a disadvantage in its dealings with its own agent.

■■■ In the instant case, the Court concludes that this fiduciary duty has not been breached. The obligation to disclose any intentions regarding the possibility of becoming a reseller upon the termination of the Agency Agreement was satisfied by CTC's negotiation of the change in the post-termination noncompetition language. As discussed above in Part III(A)(3), the third sentence of the noncompetition clause permits CTC to act as a reseller to the customers it serviced on behalf of Bell Atlantic under the Agency Agreement following the termination of the Agency Agreement. The Court determines that the record indicates that CTC disclosed its intentions regarding possible post-termination resale to those particular

---

**11.** While Bell Atlantic has consistently argued that CTC has breached its post-termination fiduciary duties to Bell Atlantic, it first raised the instant argument, alleging a breach of fiduciary duty during the negotiations of the Agency Agreement, in its post-hearing memorandum. *See* Bell Atlantic's Post–Trial Memorandum of Law in Support of Permanent Injunction and Declaratory Judgment (Docket No. 84) at 1–2. At this stage of the proceedings, the parties were filing briefs simultaneously. Therefore, CTC did not address this argument.

customers during the negotiations and that, in fact, the 1996 Agency Agreement reflects such an intent.[12] Therefore, CTC did not breach its duty to disclose material information unknown to its principal.

### 2. CTC's Use of Confidential Information

#### a. Declaratory Relief

In Count V, Bell Atlantic argues, in part, that CTC's past or future use of confidential information belonging to Bell Atlantic, after the termination of the Agency Agreement in December of 1997, in soliciting the customers it had serviced as Bell Atlantic's agent is a breach of fiduciary duty.[13] In connection with this claim, Bell Atlantic seeks declaratory relief establishing that any use of Bell Atlantic's confidential information would constitute a breach of CTC's fiduciary duties to Bell Atlantic.[14] CTC argues that

12. Bell Atlantic points out that CTC never explicitly told Bell Atlantic that it planned to sell Intra-LATA services after the termination of the Agency Agreement. *See* Tr. at 196. Bell Atlantic strenuously argues that, by not explicitly informing Bell Atlantic that it intended to sell Intra-LATA services to former customers, CTC breached a fiduciary duty owed to Bell Atlantic. The Court does not find that it is contradictory for CTC to claim it did not have a *plan* to become a reseller of IntraLATA services to the forbidden Bell Atlantic customers, yet negotiate a favorable term in the eventuality that CTC's agency relationship with Bell Atlantic was terminated, especially in light of the uncertain state of federal communications law at the time of the negotiations.

13. Bell Atlantic also asserts that CTC's solicitation of the customers that CTC had serviced on behalf of Bell Atlantic is a violation of CTC's fiduciary obligations to Bell Atlantic. CTC argues that its fiduciary obligations, as they exist after the termination of the Agency Agreement, do not prohibit such conduct. It is settled law that, during the scope of an agency relationship, an agent has a fiduciary duty not to compete with its principal with respect to matters within the scope of the agency relationship. *See Apollo Technologies v. Centrosphere Indus.*, 805 F.Supp. 1157, 1195 (D.N.J.1992) (applying New York law); *Restatement (Second) of Agency* §§ 389, 393. Absent an agreement to the contrary, however, an agent may compete with its principal after the agency relationship terminates. *Restatement (Second) of Agency* § 396(a) (providing that, after the termination of the agency, the agent "has no duty not to compete with the principal."). As the Court has discussed above

Bell Atlantic has not satisfied its burden of proving that CTC has confidential information belonging to Bell Atlantic and that CTC has used such information inappropriately in violation of a fiduciary duty.

"[A]n agent has a duty 'not to use confidential knowledge acquired in his employment in competition with his principal.'" *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir.1983) (quoting *Byrne v. Barrett*, 268 N.Y. 199, 197 N.E. 217, 218 (1935)). The agent continues to be bound by this duty after the termination of the agency relationship. *Id.; see also Restatement (Second) of Agency* § 396. Section 396(b) of the *Restatement (Second) of Agency* provides that after the termination of the agency, the agent

has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competi-

in Part III(A)(3), the post-termination noncompetition clause specifically permits CTC to resell telecommunications services to the customers CTC had serviced on behalf of Bell Atlantic during the life of the Agency Agreement. The Court concludes that, in light of the fact that the contract between the parties permits this conduct, CTC's solicitation of Bell Atlantic's former customers does not violate its fiduciary duty to Bell Atlantic.

14. The comment to section 395 of the *Restatement (Second) of Agency*, governing the duty not to disclose confidential information during the course of the agency, provides that the section applies "not only to those communications which are stated to be confidential, but also to information which the agent should know his principal would not care to have revealed to others or used in competition with him." *See also Apollo Technologies*, 805 F.Supp. at 1196. Under that definition of the term "confidential," all of the information CTC accumulated during the course of its agency relationship with Bell Atlantic, including Agent "I" files (customer service records, service orders, and customer attitude surveys), Customer Proprietary Network Information, and customer lists, is confidential.

There was some evidence presented at the hearing, and argumentation in support thereof, that the customer proprietary network information, customer surveys, and Agent I information belonged to Bell Atlantic's customers and not to Bell Atlantic. Although the information itself may belong to the customer, the compilation of the information in Bell Atlantic's format is confidential and belongs to Bell Atlantic.

tion with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent is entitled to use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent.

The comment to section 396(b) states in part:

The duty of an agent not to compete with the principal by using for his own purposes unique assets of the business, such as trade secrets, which are frequently of great value as long as they remain secret, does not terminate with the employment.... On the other hand, during his agency, an agent frequently acquires information concerning the methods of his employer in doing business and becomes acquainted with his employer's customers and their desires. Information of this sort is barred from use in competition only to the extent that, considering all the circumstances, it would be unfair to his employer for the agent to use it.

■■■ The testimony at the hearing established that CTC used the confidential information in January 1998 to solicit former Bell Atlantic customers.[15] Tr. at 225–26. CTC continues to possess that confidential information acquired during CTC's employment as an agent for Bell Atlantic. Given the Court's decision above regarding permissibility of soliciting former clients, CTC could, and likely would if given the opportunity,[16] use the confidential information to promote and sell telecommunications services which compete directly with Bell Atlantic services.

Section 396 of the *Restatement (Second) of Agency* supports Bell Atlantic's assertion that CTC's use of any such confidential information violates its fiduciary duty to Bell Atlantic. CTC has taken with it the sort of information which section 396 prohibits an agent from using in competition with its principal after the agency relationship is terminated. Therefore, the Court declares that any further use of Bell Atlantic's confidential information by CTC in soliciting customers constitutes a breach of CTC's fiduciary duty, under New York law, to Bell Atlantic.

### b. Injunctive Relief

With respect to Bell Atlantic's requested permanent injunction preventing CTC from ever using the confidential information in its efforts to solicit former customers, the Court must consider the nature of the restrictions placed on permanent injunctive relief. "The standard for issuing a permanent injunction requires the district court to find that (1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *A.W. Chesterton Co. v. Chesterton,* 128 F.3d 1, 5 (1st Cir.1997) (citing *Indian Motorcycle Assoc. III Ltd. Partnership v. Massachusetts Housing Fin. Agency,* 66 F.3d 1246, 1249 (1st Cir.1995)). The Court finds it unnecessary to discuss in detail three of the permanent injunction prongs. As the Court found above, Bell Atlantic prevails on the merits of this aspect of its breach of fiduciary duty claim. Moreover, the balance of the harms on the confidential information issue weighs in favor of Bell Atlantic, and the public interest is best served by not allowing parties, once in an agency relationship, to breach their fiduciary duty to keep all information

---

**15.** CTC's use of the confidential information occurred in January of 1998. CTC has not continued to use the information because the TRO, implemented on January 30, 1998, forbids such use. The Court has examined the cases presented by Bell Atlantic indicating that New York courts award injunctive relief against further solicitation of the principal's customers for a former agent's breach of the fiduciary duty not to use the principal's confidential information in competition with the principal. *See Props for Today, Inc. v. Kaplan,* 163 A.D.2d 177, 558 N.Y.S.2d 38, 39 (N.Y.App.Div.1990); *Webcraft Technologies, Inc. v. McCaw,* 674 F.Supp. 1039, 1047 (S.D.N.Y.1987). The Court, however, declines to award such injunctive relief in this case as a punishment for a past violation of a fiduciary duty.

**16.** The Court makes this observation despite CTC's assertion that the information is now stale and of no use in soliciting customers.

acquired during the course of the agency relationship confidential.

The irreparable harm prong requires more discussion. Bell Atlantic asserts that the Court should apply the standard used by the New York courts. CTC disagrees. Although the Agency Agreement between Bell Atlantic and CTC states that "[t]his Agreement is governed by the laws of the State of New York," the Agreement does not control the appropriate standard utilized by this Court for irreparable harm on Bell Atlantic's request here for injunctive relief. CTC Ex. 1 § M.6, at 25. Applying this Court's standard of irreparable harm, the Court nevertheless concludes that CTC should be barred from using any of the confidential information, including the customer lists, gained during its agency relationship with Bell Atlantic to solicit, sell, or promote its services as a reseller.

▬▬▬ Bell Atlantic has the burden of proving irreparable injury to justify the award of a permanent injunction. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 18 (1st Cir.1996) "Where the harm is not measurable, it is not an abuse of discretion to award equitable relief." *A.W. Chesterton Co.,* 128 F.3d at 8; *see also Ross–Simons of Warwick, Inc.,* 102 F.3d at 19 ("If the plaintiff suffers a substantial injury that is not accurately measurable or compensable by money damages, irreparable harm is a natural sequel."). "[T]he availability of money damages at law in the future cuts heavily against a conclusion that the injury which would call forth such an award is irreparable in nature. This is because it is thereby established that there is an alternative to equitable intervention: an adequate remedy at law." *Merrill Lynch, Pierce, Fenner & Smith v. Bishop,* 839 F.Supp. 68, 74 (D.Me. 1993). The Court has broad discretion in evaluating whether the alleged harm is irreparable in nature. *K–Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915 (1st Cir.1989).

▬▬▬ The Court finds that any future injury suffered by Bell Atlantic as a result of CTC's use of Bell Atlantic's confidential information will escape accurate measurement in a determination of the amount of recoverable damages as an element of legal relief. As explained in Part III(A)(3), the Court has determined that the Agency Agreement does not prohibit CTC from soliciting those customers it serviced on behalf of Bell Atlantic. The potential wrongful conduct at issue here is a subset of soliciting, that is, soliciting by means of Bell Atlantic's confidential information. The Court finds that the task, necessary in any future determination of damages, of parsing any wrongful conduct from the ultimately permissible conduct (the solicitation itself) renders the harm caused by any breach of the duty not to use the confidential information irreparable because such harm is inextricably bound up in undemonstrable ways with the effect of the act of solicitation itself and is, therefore, both vaporous and incalculable. Therefore, the Court is persuaded that Bell Atlantic has made the necessary showing of irreparable harm to justify injunctive relief on this element of its claim. Based upon the four considerations for permanent injunctive relief, the Court concludes that CTC should be enjoined from any future use of confidential information obtained during the course of its agency relationship with Bell Atlantic in any future solicitation of Bell Atlantic customers.

## IV. CONCLUSION

After a full hearing on Plaintiff CTC's Motion to Dissolve the Temporary Restraining Order (Docket No. 38) and Defendant Bell Atlantic's oral Motion for a Permanent Injunction [17] it is hereby **ORDERED** that:

(1) Plaintiff CTC's Motion to Dissolve the Temporary Restraining Order (Docket No. 38) be **GRANTED** and the Temporary Restraining Order by the United States District Court for the Southern District of New York, Wood, D.J., on February 4, 1998, be **VACATED;**

(2) Plaintiff's Motion for a Permanent Injunction enjoining CTC from selling, representing, or promoting until after December 30, 1998, any Bell Atlantic IntraLATA services to any

---

17. The Court will, by agreement of counsel, decide the Motion for a Permanent Injunction upon

the merits of the claims for declaratory relief and injunctive relief.

Bell Atlantic business customer for whom CTC was responsible under the AMP program, or to whom CTC sold any Bell Atlantic service, be **DENIED;**

(3) CTC be, and is hereby, **ENJOINED** from making any use or disclosure of confidential information of Bell Atlantic acquired by CTC while acting as an agent of Bell Atlantic; and it is **FURTHER ORDERED** that CTC return to Bell Atlantic *forthwith* any physical representation of any such confidential information that has not already been returned to Bell Atlantic and *forthwith* erase from any computer any data or backup data belonging to CTC, or to which it or its employees have access, or any representation of any such confidential information, including any and all Agent I information (customer service records, service orders, and customer attitude surveys), customer lists, Customer Proprietary Network Information, *provided,* with respect to Agent I information, CTC shall be permitted to retain data or hard copies of service orders contained therein *on condition* that such service orders be segregated from information available for use by any person engaged in sales operations for CTC. It is **FURTHER ORDERED** that CTC shall file, within five (5) days of the date of the docketing of this order, the certification, under oath, of Robert Fabbricatore, attesting that all of the requirements of this ¶ (3) have been fully complied with;

(4) By agreement of the parties, CTC is **ENJOINED** from making any use of the trademark, trade names, or commercial logos of Bell Atlantic in any solicitation of sales or provision of services to any Bell Atlantic business customers.[18] Tr. at 365–66.

---

18. The Court notes that no evidence has been presented that CTC has made any improper use of such trademarks, trade names, or logos to date.